## FEDERAL UNDERWRITERS EXCHANGE v. GUEST et al.
### No. 1901.

Court of Civil Appeals of Texas. Eastland.
April 28, 1939.

Rehearing Denied June 9, 1939.

Benbow, Saunders & Holliday, of Dallas, for plaintiff in error.

Grindstaff, Zellers & Hutcheson, of Weatherford, Touchstone, Wight, Gormley & Price, of Dallas, and E. S. Cummings, of Abilene, for defendants in error.

GRISSOM, Justice.

This is an appeal by Federal Underwriters Exchange from a judgment in favor of the plaintiff, Gay Guest, in a case wherein two Workmen's Compensation cases were consolidated. Both cases grew out of the same injury sustained by Gay Guest on October 8, 1936, when a line broke and let a joint of casing fall on him while he and other members of the "Good Luck Casing Crew" were running pipe in an oil well being drilled by S. C. Herring. Herring's driller was in charge of the oil well drilling operations when Guest was injured. The Federal Underwriters Exchange paid Guest compensation for a short time and then stopped making payments. Proceedings were had before the Industrial Accident Board and separate suits later filed by Guest against Federal Underwriters Exchange, the compensation carrier of J. T. Evetts, doing business as the "Good Luck Casing Crew," and Casualty Underwriters, the compensation insurance carrier for S. C. Herring. The Hendrick Memorial Hospital intervened in said causes. The judgment was for Guest against the Federal Underwriters Exchange, and favorable to the Casualty Underwriters and the Hospital; the Federal Underwriters Exchange alone has appealed. Other facts necessary to an understanding of the questions presented will appear in a discussion thereof.

The Federal Underwriters Exchange contends, by its propositions one and two, that the judgment should be reversed and the cause dismissed for want of jurisdiction, because: First, the proceedings before the board were not sufficient to show a claim within the jurisdiction of the board, nor within the jurisdiction of the district court. Second, because the certified copy of the award of the board does not show that it is (a) the act of the Industrial Accident Board, or (b) the act of a majority of the members thereof, and (c) it does not show to be a final ruling or decision of the board from which an appeal may be taken.

■ It has recently been held by our Supreme Court that it is not necessary either for the purpose of showing jurisdiction of the board, or as a predicate to the jurisdiction of the court in which a suit may be filed to set aside the award of the board, that the claim filed with the board state the amount claimed by the employee, or facts from which such amount can be definitely determined. Booth v. Texas Emp. Ins. Ass'n, Tex.Com.App., 123 S.W.2d 322, 331; Traders & General Ins. Co. v. Belcher, Tex. Civ.App., 126 S.W.2d 35, and cases there cited.

■ The concluding sentence of section 8 of Art. 8307, Vernon's Ann.Civ.St., provides: "Any order, award or proceeding of said board when duly attested and sealed by the board or its secretary shall be admissible as evidence of the act of said board in any court in this State." The copy of the award introduced in evidence bore the usual certificate and seal of the secretary of the Industrial Accident Board. Under the statute it was admissible and constituted evidence of the act of said board. Certainly the presumption is that it was valid. The award which said defendant contends was not such a final award as could be appealed from is as follows:

"Gay Guest, Employee vs. Good Luck Casing Crew, Employer. Federal Underwriters Exchange, Insurer.
"W–2440

"On this 22nd day of April, 1937, after due notice to all parties, came on to be considered by Industrial Accident Board claim for compensation by Gay Guest against Federal Underwriters Exchange, and Board finds and orders:

"On October 8, 1936, Good Luck Casing Crew, a subscriber to the Employers' Liability Law with insurance carried by Federal Underwriters Exchange had in its employ Gay Guest whose average weekly wage was $24.34, and compensation rate $14.61 per week under the Act. On said date Gay Guest suffered injuries in course of employment resulting in his total incapacity for

performance of labor for an indefinite period in the future not exceeding 401 weeks.

"Federal Underwriters Exchange is ordered to pay Gay Guest $14.61 per week for an indefinite period in the future not exceeding 401 consecutive weeks from October 8th, 1936, unless changed by subsequent award of the Board. Previous payments of compensation, if any, shall be deducted from award."

■ The following authorities are relied upon by Federal Underwriters Exchange to support its contention that said award is not final and, hence, not appealable. Texas Emp. Ins. Ass'n v. Marsden, 127 Tex. 84, 92 S.W.2d 237; Petroleum Cas. Co. v. Webb, 127 Tex. 91, 92 S.W.2d 236; Tally v. Texas Emp. Ins. Ass'n, Tex.Com.App., 48 S.W.2d 988; Texas Emp. Ins. Ass'n v. Lemons, 125 Tex. 373, 83 S.W.2d 658; Jones v. Texas Indemnity Ins. Co., Tex. CivApp., 15 S.W.2d 1077; Arter v. Southern Surety Co., Tex.Civ.App., 29 S.W.2d 847, affirmed, Tex.Com.App., 44 S.W.2d 913. The Marsden, Webb, Tally and Lemons cases, supra, are hernia cases. It has been definitely decided in such cases that the award of the board directing the insurance carrier to furnish the compensation claimant an operation is not a final appealable award of the board. Tally v. Texas Emp. Ins. Ass'n, Tex.Com.App., 48 S.W.2d 988. Said cases have no application to the award in question and are not decisive of the question of whether the award is appealable. Jones v. Texas Indemnity Ins. Co., Tex.Civ.App., 15 S.W.2d 1077, writ refused, a decision by this court, merely holds that a letter by the board to a claimant's attorney simply declining said attorney's request for an immediate hearing of the claim, the board having never considered the claim on its merits, was not a final, and, therefore appealable award of the board. The only case cited by Federal Underwriters Exchange which we consider in any degree sustains its contention is that of Arter v. Southern Surety Co., Tex.Civ.App., 29 S.W.2d 847, 849. It was there stated:

"While the board determined that 'the injury appellant sustained 'totally incapacitated him for the performance of labor,' it did not determine either that such incapacity was permanent or that it would continue as long as 401 weeks. It in effect determined to the contrary when it found, as is shown in the statement above, that appellant's incapacity would continue for an indefinite period.

"To mature the award as prayed for by appellant, this court would have to say, contrary to the conclusion of the board, that his total incapacity to labor would continue as long as 401 weeks from the time he suffered the injury.

"The judgment will be reversed, and judgment dismissing appellees' suit will be rendered here."

A writ of error was granted in that case, and, while the judgment of the Court of Civil Appeals was affirmed, it was without reference to the decision quoted. See Southern Surety Co. v. Arter, Tex.Com. App., 44 S.W.2d 913.

In Lumbermen's Reciprocal Association v. Warren, Tex.Civ.App., 272 S.W. 826, 827, writ refused, an award of the Industrial Accident Board in all material respects substantially like the one under attack in this case was sustained against the contention that it was not a final award of the board and, therefore, not appealable. The award and the decision of the court on said question are shown by the following quotation from the opinion in said case:

"'The Board further finds that, in consequence of said injuries, the said R. N. Warren suffered total incapacity for the performance of labor from September 8, 1923, down to this date, and will continue to suffer said total incapacity for an indefinite period in the future, and he is therefore entitled to recover and be paid compensation herein at the rate of $10.38 per week, beginning on September 16, 1923, and continuing thereafter down to and including this date, and to continue for an indefinite period in the future and until and unless altered, changed, modified, or terminated by subsequent agreement between the parties, in accordance with the terms and provisions of the employer's liability act, and subject to the approval of the Industrial Accident Board, or until and unless altered, changed, modified, or terminated by subsequent order, award, judgment, or decree of the Industrial Accident Board, but in no event to continue for a longer period than 401 weeks from and after September 8 1923.'

"Article 5246-44 of Vernon's Ann.Civ. St.Supp.1918 [Vernon's Ann.Civ.St. art. 8307, § 5], provides that an appeal may be prosecuted only from a final ruling or order. Appellant contends that the order in this case was not final but a continuing order. This criticism is without merit.

Under the provisions of the Act (art. 5246-25 [Vernon's Ann.Civ.St. art. 8306, § 12d]) it is provided that the Board may on certain conditions review its award at any time during the compensation period. It follows from this article that the Board has no authority to make any award on facts similar to the facts of this case other than was in fact made."

The quoted language of Judge Walker is adopted by us as our decision of the question presented. The proposition is overruled. Vestal v. Texas Emp. Ins. Ass'n, Tex.Com.App., 285 S.W. 1041.

Federal Underwriters Exchange, in its propositions 5 to 17, inclusive, presents its contention that defendant-in-error Gay Guest was not an employee of J. T. Evetts; that J. T. Evetts was not an independent contractor; that Guest and J. T. Evetts and the other members of the casing crew, doing business under the name of "Good Luck Casing Crew," were partners or joint adventurers; that plaintiff Guest and the other members of the casing crew were under the direction of the drilling contractor S. C. Herring and Herring's driller in charge of the well, Ira Yarbro, and, therefore, Guest was an employee of Herring, within the contemplation of the Workmen's Compensation Law. It is further contended that the submission of the issues relative thereto was not justified by the evidence; and that the answers of the jury thereto were not supported by the evidence. From all of which it concludes the trial court should have instructed the jury to return a verdict for said defendant and this court should reverse the judgment rendered for Guest and render judgment for it.

The court submitted to the jury, among others, the following special issues which were answered as shown:

" (4) Do you find from a preponderance of the evidence, that the personal injuries, if any, received by the plaintiff, were received by him while he was engaged in the course of his employment for J. T. Evetts, doing business as the Good Luck Casing Crew? Answer yes or no. Answer: Yes.

" (5) Do you find from a preponderance of the evidence that at the time plaintiff sustained personal injuries, if any, he was an employee of S. C. Herring? Answer yes or no. Answer: No."

" (7) Do you find from a preponderance of the evidence that on the 8th day of October, A. D. 1936, J. T. Evetts, doing business as Good Luck Casing Crew, was running the casing in question, as an independent contractor? Answer yes or no. Answer: Yes."

" (28) Do you find from a preponderance of the evidence that S. C. Herring had the right to direct the details of the work the said Gay Guest was doing at the time of his injuries, if any? Answer yes or no. Answer: No.

" (29) Do you find from a preponderance of the evidence that Ira Yarbro had the right to direct the details of the work the said Gay Guest was doing at the time of his injuries, if any? Answer yes or no. Answer: No."

There is evidence authorizing a finding of the following facts: That J. T. Evetts was in the casing crew business, doing business under the name of Good Luck Casing Crew, at the time and long prior to the time that the plaintiff Gay Guest was injured. That for more than a year prior to the date of the injury, Gay Guest had been working for J. T. Evetts as a member of one of Evetts' casing crews, their business being to "run" and "pull" casing from oil wells. A casing crew consists of five men. On the particular casing crew with which Gay Guest worked, Jim Evetts, brother of J. T. Evetts, was the foreman. J. T. Evetts owned and furnished the usual equipment for a casing crew and owned and furnished the equipment used by this casing crew at the time of Guest's injury, to-wit: "A casing pole, never-slip, spinning rope and front rollers." Prior to Guest's injury, J. T. Evetts made an agreement with S. C. Herring, a drilling contractor, engaged in drilling a well in Jones County, Texas, to do the casing crew work for Herring; that is, to run and pull the pipe on wells that Herring drilled. That under the agreement Herring was to pay Evetts $30 for running or pulling a string of pipe of more than 700 feet and $20 for running or pulling a string of pipe of less than 700 feet, such amount to be paid upon completion of each job. The particular job on which the casing crew was at work at the time Guest received his injury consisted of running a string of pipe of more than 1,000 feet, for which Herring paid Evetts $30. Evetts obtained the jobs, carried workmen's compensation insurance upon his crews, furnished cars to carry the members of the casing crew to work and back home, and furnished his casing crew equipment. Out of the $30 received by Evetts from Herring for such "a job"

Evetts paid each of the five members of the casing crew $4.25 and the remaining $8.75 was retained by Evetts. For running or pulling a string of casing less than 700 feet Evetts habitually received $20 and paid each of the casing crew $3.25. Evetts' insurance carrier was the Federal Underwriters Exchange. Herring, the oil well drilling contractor, carried workmen's compensation insurance with the defendant, Casualty Underwriters. That the casing crew men have a calling or profession like a driller or tool dresser. That the casing crew business is operated independently of the business of drilling oil wells. That the agent for Federal Underwriters Exchange who came to see J. T. Evetts with reference to writing his workmen's compensation insurance policy for his casing crew employees was told the details of the kind of business and method of operation of Evetts' casing crew business. Evetts testified:

"A. I told him what kind of business I was in, I told him I was running and setting and pulling pipe in oil and gas wells.

"Q. How the work was done, and what you paid for it? A. Yes sir.

"Q. Did he give you any instructions with reference to the pay rolls on that kind of work? A. No sir.

"Q. About the premiums? A. Yes sir.

"Q. That premium was based, was it not, upon the amount of money that you paid your men on the pay rolls? A. Yes sir.

"Q. Did he tell you to report that to the company, as the basis for the premium? A. Yes sir.

"Q. Did you report the pay roll to the Federal Underwriters Exchange, based upon the work your men were doing? A. On work that I paid for, yes sir.

"Q. Did you report to the Federal Underwriters Exchange the payroll on this very job on which the boy was hurt? A. Yes sir.

"Q. Did they take the premium on that? A. Yes sir.

"Q. Did they keep it? A. Yes sir.

"Q. Have they ever offered to give it back to you? A. No sir."

The evidence showed that Guest was never on the payroll of the contractor Herring, and no premium on Guest, or any other member of the casing crew, was ever paid by Herring to his insurance carrier, Casualty Underwriters.

There was evidence that while Guest was engaged, as a member of Evetts' casing crew, in running the casing on the well being drilled by Herring that Guest received an accidental injury; that the injury was such as to totally and permanently incapacitate him. At the time of Guest's injury, Ira Yarbro was Herring's driller in charge of drilling operations. That Herring's tool dresser was at that time on the job. We quote from the testimony relative to the relationship between the persons employed to drill the well for Herring and Evetts' casing crew, the following:

"Q. Now, did those men have anything to do with the work of running this casing? A. They just ran the engine.

"Q. What engine, now? A. The drilling engine and the hoisting engine and the derrick.

"Q. What does the hoisting engine— what part does it play, with reference to the running of this casing? A. It just furnishes the power.

"Q. You spoke of this casing being elevated, swung in the air, when one of those slips was put around the end of it * * * that power came from the engine; is that right? A. Yes.

"Q. Who operates that engine now? A. Mr. Yarbro, the driller.

"Q. Who signals him to start the engine? A. Well, when the man we call the 'hook man' puts the pick up line on, is the signal for him to pull it up.

"Q. Were you the one that connected the pick up? A. Yes sir.

"Q. You connected that pick up line, and then the power is ready to be turned on, to swing the joint of casing perpendicular in the air, is that right? A. Yes sir.

"Q. When you do that, do you give him any signal? A. I catch hold of the pick up line back here (indicating) and I step back to where he can see it is on the pipe.

"Q. Then he turns on the power? A. Yes sir.

"Q. And that elevates it? A. Yes sir.

"Q. What does this tool dresser do? A. He just shifts the pinion there. There is a pinion there that makes the elevator go up or come down. He shifts the pinion.

"Q. What do you mean by that? Just tell us like we didn't know a thing about

it. A. Well, there is just a pinion there. Just a piece of pipe that you can shift the cog in there, you see. He. throws the power one way and that makes the elevator go up, or he throws it the other way and makes the elevators come down.

"Q. In other words, if you left the casing in the air you can shift that and lower it? A. Yes, he would just shut the power off, but he has to shift the pinion before it comes down.

"Q. That is the tool dresser? A. Yes.

"Q. Who gives him his signal? A. He knows by the work, when they get through pulling the pipe up, hè knows to pull the slips and let the pipe down in the hole.

"Q. As far as your work there was concerned, tell us who you took your instructions from? A. I took them from Jim Evetts.

"Q. He was the foreman of the crew? A. Yes sir.

"Q. Did you ever on that job take any instructions from Yarbro? A. No.

"Q. Did you ever take any from this tool dresser? A. No.

"Q. Did they assign any reason to you when they quit paying you compensation, the Federal Underwriters Exchange? Did Mr. Massey or Mr. Mobley say anything to you why they quit paying you? A. No sir, they just stopped paying me and wanted to try to settle.

"Q. Did they tell you at that time you were not working for Mr. Evetts? A. No.

"Q. All during the time, up until the trial last fall, did they even indicate that you were not working for Evetts? A. No sir."

S. C. Herring testified, in part, as follows: That he was a drilling contractor, that he was drilling the well on which Gay Guest was injured for N. H. Martin in Jones County. That he had a contract for the casing work to be done on that well with J. T. Evetts:

"Q. What was the consideration for your contract with him? A. $30 for a string of pipe running or pulling.

"Q. Did you employ the men on his crew? A. No sir.

"Q. Did you fire the men on his crew? A. No sir.

"Q. Did you select the men on his crew? A. No sir.

"Q. Did you direct the men on his crew on this job? A. No sir.

"Q. Did you have a policy of insurance with the Casualty Underwriters? A. Yes sir.

"Q. Did you every carry Gay Guest on your pay roll? A. No sir.

"Q. Did you ever pay the Casualty Underwriters a cent of premium based on Gay Guest's work, or any other casing crew work? A. No sir.

"Q. In paying your premiums to the Casualty Underwriters you didn't take into consideration anything that was paid to the casing crew? A. No sir.

"Q. You reported only your own employees? A. Yes sir.

"Q. Mr. Herring, did you give Ira Yarbro the right to boss the casing crew? A. No sir.

"Q. Did you give him authority to stop the casing crew? A. No sir.

"Q. Did you give him any authority at all over the casing crew? A. No.

"Q. Did you at any time ever have any dealing with Gay Guest? A. No sir.

"Q. Who were your dealings with in regard to the casing work? A. J. T. Evetts.

"Q. So far as you know, did your driller or tool dresser give any instructions to the casing crew? A. None that I know of.

"Q. Or have any right to boss them, as far as you were concerned as to the details of the work? A. No."

Jim Evetts, a brother of J. T. Evetts, was the foreman in charge of the casing crew with which Guest worked. He testified, in part, as follows:

"Q. Did you have any instructions to take any orders from Yarbro? A. No.

"Q. Who was your boss? A. My brother.

"Q. Is he the one that gives the directions and instructions? A. He did.

"Q. Did the driller out there that day give you any instructions? A. No.

"Q. Did he boss you? A. No.

"Q. Did he try to direct you? A. No sir."

■ To attempt to set out all of the testimony pertinent to issues to be discussed would extend this opinion to an unreasonable length, and, we think, is unnecessary. The defense of partnership or

joint adventure was not pleaded by either of the defendant insurance companies. The Federal Underwriters Exchange merely alleged that Guest was "an employee of Herring or some other person, firm or corporation." The issue of partnership or joint adventure was not submitted to the jury and its submission was not requested by the Federal Underwriters Exchange. Without further quotation of the testimony, or discussion, we think it proper to state our conclusion that unquestionably it was not established as a matter of law that Guest, at the time of his injuries, was an employee of Herring, the drilling contractor. Neither was it so established that Guest was a partner or joint adventurer with the other members of the Good Luck Casing Crew. On the contrary, we think the evidence, at least, raises the issue that Guest was the employee of Evetts, whose compensation insurance was carried by the defendant, Federal Underwriters Exchange. We are further of the opinion that the evidence raised the issues submitted to the jury and complained of by said defendant and is sufficient to sustain the answers of the jury thereto. We are convinced that these conclusions are definitely sustained by the following decisions: Tanner v. Drake, Tex.Civ.App., 47 S.W.2d 452, affirmed, 124 Tex. 395, 78 S.W.2d 162; Shannon v. Western Indemnity Ins. Co., Tex.Com.App., 257 S.W. 522; Dennis v. Texas Emp. Ins. Ass'n, Tex.Civ.App., 116 S.W.2d 492; Jones v. Fann, Tex.Civ.App., 119 S.W.2d 735.

 The testimony pertinent to the matter of plaintiff's wage rate was, to the effect, that plaintiff had been continuously for more than a year prior to the accident employed in the same position by the same employer. That plaintiff worked on 25 jobs a month and that his average monthly wage ranged from $106 to $110. That plaintiff worked about 25 days a month; that his average daily wage during the 300 days in which he worked during the year preceding his injury was $4.25. We quote from the plaintiff's testimony as follows:

"Q. And you worked about 25 days a month; is that what you mean? A. Yes sir. * * *

"Q. You were subject to call any time? A. Yes sir.

"Q. Some months you ran more jobs than 25, and some less? A. Yes sir.

"Q. But the average—what is the average time now, you say, per job—I mean with reference to days? A. About six hours.

"Q. Counting the time you would go out and come back, about a day to the job? A. Yes sir.

"Q. A day's work to the job? A. Yes sir.

"Q. And the pay, I believe you said, ran an average of about $4.25 per day; is that right? A. Yes sir. * * *

"Q. That is correct—in other words, throughout that 12 months period, your work was intermittent and spasmodic, depending upon the number of jobs you had to do? A. Yes sir."

The testimony was to the effect that neither plaintiff nor his employer kept a record showing plaintiff's annual income for the year preceding his injury. The testimony further showed that another person employed with the same casing crew had worked more than a year for the same employer at the same employment prior to plaintiff's injury, and that all of the quoted and stated facts with reference to plaintiff were applicable to said other employee.

Under the conditions indicated, it is contended by the Federal Underwriters Exchange that plaintiff's work was discontinuous, irregular and intermittent and that the only fair, reasonable and proper way for computing plaintiff's average weekly wage would be to take 1/52nd of his actual earnings for the preceding year under subd. 5, sec. 1, Art. 8309; that plaintiff failed to prove or submit any issue on the amount of money actually earned by him for the year preceding his injury, and, therefore, failed to establish a necessary element of his cause of action; wherefore, it concludes, said defendant's motion for an instructed verdict should have been granted; and further that the court erred in basing its judgment on plaintiff's daily wage on the days when employed, multiplying same by 300 and dividing same by 52 under subd. 1, sec. 1, Art. 8309.

The evidence as to plaintiff's wage rate is not controverted. Plaintiff's testimony relative thereto is in all material respects in accord with that of his employer. The sum of $4.25 per day for 25 days per month would amount to $106.25. The compensation rate was fixed at $14.71 per week. This was evidently arrived at by multiplying $4.25, the average daily wage, by 300 and dividing the result by 52, and

taking sixty per cent thereof. Under the contention of the Federal Underwriters Exchange, plaintiff's actual earnings for the year would be divided by .52 in order to obtain plaintiff's average weekly wage. Sixty per cent of such average weekly wage then would be plaintiff's compensation rate. If the method suggested by Federal Underwriters Exchange be followed on a monthly wage of $106, the compensation rate would be $14.68 per week, or approximately 3¢ per week less than that found by the court. If calculated on a monthly rate of $110 the compensation would be higher than that fixed by the court. We are inclined to the view that plaintiff's compensation rate should be determined by the provisions of subd. 1, sec. 1, Art. 8309. However, under the circumstances mentioned, we think it is immaterial since the result is practically the same. We think the maxim de minimis non curat lex is applicable.

Federal Underwriters Exchange presents 101 assignments of error and many propositions thereunder. They have been considered. We think reversible error is not shown. The judgment is affirmed.